213 So.2d 353 (1968)
Charlie B. CRIPPS, Plaintiff and Appellant,
v.
URANIA LUMBER COMPANY, Ltd., Defendant and Appellee.
No. 2414.
Court of Appeal of Louisiana, Third Circuit.
July 29, 1968.
Rehearing Denied August 20, 1968.
*354 Garrett & Ryland, by Donald M. Garrett, Alexandria, and Long & Sleeth, by Lewis R. Sleeth, Jena, for plaintiff-appellant.
Gaharan & Richey, by L. W. Richey, Jena, for defendant-appellee.
Before TATE, HOOD and CULPEPPER, J.
CULPEPPER, Judge.
The plaintiff, Charlie B. Cripps, seeks workmen's compensation benefits for total and permanent disability allegedly resulting from an accident while working for the defendant, Urania Lumber Company, Ltd. From an adverse judgment, plaintiff appeals.
There can be little dispute that when workmen's compensation payments were stopped eight weeks after the accident of July 14, 1965, plaintiff was disabled by mental and emotional symptoms. The substantial issue is whether these mental problems are causally related to the accident. Defendant contends plaintiff suffered with pre-existing mental disease and that the present symptoms were neither caused nor aggravated by the accident. Plaintiff contends the accident caused the present disability.
The facts show that plaintiff, a white male, was born in 1931 on a small farm in north Louisiana. He continually failed in school. At the age of about sixteen he dropped out, after completing only the third grade, and worked on his father's farm. Tests show that he has an I.Q. of about 61, which is marginal retardation.
In about 1957, at the age of twentysix, he obtained employment as a laborer for International Paper Company, where he worked for two years. While working for International, he allegedly sustained an injury, a strain of the muscles of the diaphragm. Dr. Bernard Doughty, a general practitioner of Jena, Louisiana, reported that the muscle strain healed, but nervous tension from the accident aggravated a pre-existing "severe psycho-neurotic" condition resulting in a disabling psycho-neurosis. Plaintiff's compensation claim against International was settled for $2,500.
A short while thereafter plaintiff returned to work on his father's farm. Then later he re-entered the common labor market and held various jobs, such as roughnecking, hauling pulpwood, working in service stations and general saw mill work.
In September of 1964 he obtained employment as a laborer for the defendant, Urania Lumber Company. A pre-employment physical by the company physician, Dr. F. A. Thomas, approved plaintiff for work as a laborer.
During the ensuing period of about one year that plaintiff worked for Urania, he sustained three accidents. The first was on October 1, 1964. He was working at the "green chain" when a board struck his head over the left eye. The wound was sutured by Dr. Thomas and plaintiff lost only one-half a days' work.
The second accident was on June 28, 1965. A board fell from over-head and *355 struck him behind his left ear. This laceration was sutured by Dr. T. L. Tannehill, and plaintiff again returned to work.
The last accident, on which this workmen's compensation suit is based, occurred on July 14, 1965. A 1" × 8" board, fourteen feet long, fell on plaintiff while in a stopped position, striking across the left part of his head, his neck and his shoulder. A cut on the back of his head was sutured by Dr. Tannehill and he was released from the clinic but did not return to work.
After continued complaints, during the next five days, of pain in his neck and shoulder, he was hospitalized, from July 24 through July 29, 1965, in the Urania Hospital. The treatment was traction and drugs for pain. He was again hospitalized from August 3, 1965 to August 6, 1965. Then the physicians in Urania referred plaintiff to Dr. C. W. Lowery, an orthopedic surgeon in Alexandria. This specialist examined plaintiff on August 11, 1965 and diagnosed a mild cervical strain with "exaggeration of symptoms" and predicted recovery in about four weeks. Dr. Lowery thought most of plaintiff's trouble was due to apprehension and tension and he prescribed librium and a cervipillow for sleep and rest.
Apparently plaintiff did not see any doctors during the next few days. On about August 17, 1965, at his home in Urania where he lived with his wife and two children, plaintiff became violent. He tore up the furniture and other family possessions. Mrs. Cripps called the sheriff and finally plaintiff was committed by the coroner to Central Louisiana State Hospital in Pineville on about August 18, 1965, where he remained for six weeks.
On his release from Central Louisiana State Hospital, plaintiff apparently went to Dr. D. L. Trax, a general practitioner in Jena. Actually, Dr. Trax had been plaintiff's family physician before the accidents in question here. This doctor's testimony is confused as to the dates on which he saw plaintiff, but it is safe to say he examined plaintiff after his discharge from Central Louisiana State Hospital and was of the opinion that due to complaints of headaches and the history of head injuries he could possibly have a brain injury. Accordingly, Dr. Trax referred plaintiff to Dr. Phillip Bonn, a neurosurgeon in Shreveport.
Dr. Bonn examined plaintiff on November 17, 1965. He ordered an EEG which was reported as "mildly abnormal", showing dysrhythmia, i.e., slow, diffuse or misfiring of the brain. On the basis of the history, a clinical examination and the EEG, Dr. Bonn was of the opinion that plaintiff was disabled by headaches. He said the man's nervous condition and the dysrhythmia of the brain was enough to explain the headaches. However, not being a psychiatrist, he would express no opinion in this field. Also, he would express no opinion as to whether the dysrhythmia preexisted the accident or was caused by it. He was of the definite opinion that there was no subdural hematoma or other residual contusion to the brain.
Dr. Charles Armistead, a psychiatrist and neurologist of Shreveport, prepared and read the EEG for Dr. Bonn. Dr. Armistead testified the EEG was "mildly abnormal", but there was no evidence of subdural hematoma and no way to tell from the EEG whether the slight brain abnormality pre-existed the accident. He said the condition could be congenital or could result from trauma, infection or other such causes.
In January of 1966 plaintiff was admitted to the Huey P. Long Charity Hospital in Pineville with complaints of headaches and nervousness. The attending physician there decided to send plaintiff to the Charity Hospital in New Orleans for further study and in connection with this transfer wrote a letter in which he summarized plaintiff's condition as follows:
"In essence this is a 34 year old, white male with a past history of a head trauma who in all likelihood is suffering *356 from post traumatic neurosis, however, because of the history of abnormal EEGs in face of a cerebral spinal fluid protein[1] elevated to 63 mg%, he is being sent to Charity Hospital for further evaluation (i.e. angiograms, brain scan).
Plaintiff was in Charity Hospital in New Orleans only one night when he "deserted" before any tests could be run. He said he just got upset and left.
At the request of his attorney, plaintiff was examined by Dr. Giles R. Morin, a psychiatrist of Lake Charles, on March 9th and 18th of 1966. He diagnosed a "chronic brain syndrome due to trauma.", defining this condition as a "natural physical disharmony in the brain, which may be due to a number of things." This physician is of the opinion plaintiff is disabled and the prognosis is poor. As to causation, he opined that the sudden onset of the mental condition after the accident, shows it was caused by the head injury. One of the symptoms found by Dr. Morin was an I.Q. of 61. Apparently, the plaintiff erroneously told Dr. Morin that he had completed the seventh grade in school, from which Dr. Morin concluded that before the accident plaintiff had a much higher I.Q. Of course, plaintiff only finished the third grade and hence there is no basis in the record for concluding that his I.Q. was suddenly reduced by the accident. This obviously weakens Dr. Morin's opinion.
In May of 1966 plaintiff was examined by Davidson H. Texada, Jr., a psychiatrist and neurologist of Alexandria, for the purpose of determining eligibility for Social Security benefits. This physician ordered an EEG which he read as normal. In explaining a possible reason for the previous EEG being read as "mildly abnormal", Dr. Texada said that some physicians consider minimal abnormality to mean that the EEG is abnormal. Dr. Texada considers that 10 to 15% of the normal population can, at any given time, show minimal abnormality and that this is a "workable margin." Also, the type of brain wave changes would indicate whether there is a definite localized brain injury. Slight, diffused, irregular slowing of the waves does not necessarily mean, in this physician's opinion, that the EEG is abnormal. It is Dr. Texada's opinion that plaintiff is schizophrenic. His diagnosis is as follows:
"My diagnosis at the time that I saw him was a schizophronic reaction, what we call the undifferentiated type, and it was chronic, and probably associated with mild mental retardation. It was also possible that he had an early nerve deafness, the origin of which I wouldn's know. I felt there was no significant residual or organic brain disease unless possibly his hearing could have been affected by an injury. It was my opinion that this patient's mental disturbance had been functional in character and not caused by any injury or trauma."
With regard to disability and causal connection with the accident, Dr. Texada testified as follows:
"Q Would you say that this individual is disabled from performing a gainful occupation such as he was previously employed at?
"A I think you would have to be seeing this man over a period of time to know how much he could be going back to it. Now at the time that I saw him, the last time that I saw him I think probably this man was disabled from working on the basis of this schizophrenic disturbance. Now this can go into remission, and he can improve and be able to go back to work.
"Q Doctor when you have a history of this individual working prior to his injury, and then a history of a violent emotional condition after the accident, can *357 it not be said that this accident played some active role in the disability?
"A I think the accident played some role in it. I think that probably a bigger factor was this man's extreme supiciousness towards his wife[2]this is what actually brought on his illness, and this has been in the background all along."
In other portions of his testimony Dr. Texada made it clear that although he did not think schizophrenia can be caused by trauma, where a man has chronic pre-existing schizophrenia, this condition can be aggravated by trauma or other tension, resulting in a period of disabling schizophrenic symptoms. The doctor testified as follows:
"Q Well that's what I'm trying to get at, Doctor, these factors that came into play immediately following the trauma with the physical pain, and in addition to that, loss of job and hospitalization are you saying that these factors could have aggravated underlying conditions?
"A This will be an aggravating factor to the man, but this in itself will not precipitate a schizophrenic illness."
Dr. Texada saw plaintiff again on March 20, 1967, this time at the request of plaintiff's attorneys. The findings and diagnosis were essentially the same. Thorazine, a standard drug for mental disease, was prescribed. Dr. Trax, the treating physician in Jena, testified that plaintiff was still taking Thorazine as of the date of the trial of this case in July of 1967.
There were several lay witnesses. Mrs. Cripps testified that before this series of accidents plaintiff was easy-going and worked regularly, whereas after these head injuries he was extremely nervous and actually became violent before his commitment to Central. Plaintiff's father testified substantially to the same effect.
Mr. Otto Kees, plaintiff's foreman at the mill, first testified that plaintiff missed work several times because of his nerves. Finally, Mr. Kees said he "guessed it was three or four times." Of course, this was during the period of almost one year that plaintiff worked for Urania Lumber Company in 1964 and 1965.
Defendant introduced the testimony of three peace officers in an effort to show that before the accident of July 14, 1965, plaintiff was already having these disabling mental symptoms and hence the injury has no causal connection with them. Deputy Clifton D. Barton, the town marshall of Olla, Louisiana, testified Mrs. Cripps came to his office complaining that in a fit of jealousy her husband had torn down the curtains and thrown the furniture around. Barton did not know the date of this visit, but said he thought it was one or two months before Mr. Cripps was committed to Central Louisiana State Hospital in Pineville. (August 18, 1965). After talking to Mrs. Cripps a few minutes, Deputy Barton discovered she lived in Burlington, in Caldwell Parish, outside Barton's jurisdiction. He therefore referred Mrs. Cripps to Sheriff Floyd D. Hodges of Caldwell Parish.
Sheriff Hodges testified Mrs. Cripps complained to him on two or three occasions about her husband's spells of rage, saying she was afraid of physical harm. The principal cause of this behavior was plaintiff's suspicion that his wife was unfaithful. On each occasion, the sheriff was successful in calming plaintiff down and assuring him that his wife had not been unfaithful.
Although there is some question about it, the trial judge concluded, and we are unable to find manifest error, that these episodes investigated by Sheriff Hodges in Burlington, Louisiana, occurred before the accident on July 14, 1965. Of course, this means the incident about which Deputy Barton testified also occurred before the accident.
*358 Plaintiff and his wife moved from Burlington, in Caldwell Parish, to Urania, in LaSalle Parish, where plaintiff worked for the Urania Lumber Company. Deputy Lorenzo Volentine testified that about one week after they moved to Urania, he investigated a complaint by Mrs. Cripps that plaintiff had taken all of the light fuses out of the house and moved to his father's home at Harrisonburg, leaving the wife and children without electricity. The deputy called plaintiff and persuaded him to return to his home in Urania. Deputy Volentine was fairly certain that this occasion occurred while plaintiff was still working for Urania.
From the above resume of the testimony, we find sufficient support for the trial judge's finding that these episodes investigated by the peace officers did indeed occur before the accident on July 14, 1965. However, this does not require a conclusion that the disability pre-existed and was not causalty connected with the accident.
Under the evidence as outlined above, several conclusions are inescapable. The first is that when workmen's compensation payments were stopped, about eight weeks after the accident, plaintiff's disability continued. This was the testimony of Dr. Trax, the treating physician in Jena, Dr. Bonn, the neurosurgeon in Shreveport, Dr. Texada, the psychiatrist of Alexandria, and Dr. Morin, the psychiatrist in Lake Charles. Actually, there is no expert medical testimony to the contrary.
The substantial issue is whether this disability is causally related to the accident. Dr. Trax and Dr. Morin were of the opinion that plaintiff was suffering from either a subdural hematoma or a traumatic neurosis directly attributable to the head injury on July 14, 1965. Dr. Bonn and Dr. Armistead found the abnormal EEGs, but would express no opinion as to whether this condition or the disability was caused by the accident. Dr. Texada's testimony, when viewed in the light of the rules of causation, established in our workmen's compensation jurisprudence, can lead to no conclusion but that plaintiff's present disability is causally connected with the accident.
Dr. Texada expressed the opinion that plaintiff is a chronic schizophrenic who suffers and will continue to suffer episodes of active symptoms, interspersed with periods of remission from symptoms. This physician stated, in the above quotation from his testimony, that the present episode is at least partially caused by tensions resulting from the pain, hospitalization, and loss of job following this accident.
We conclude the medical testimony clearly preponderates in favor of a finding of causation between the disability and the accident of July 14, 1965.
Defendant's strongest argument against such a causation is the trouble plaintiff was having with his wife before the accident. However, we have on the other hand the fact that, although plaintiff was having these marital difficulties at home, he had worked in the common labor market for several years. He had worked regularly for the defendant, Urania Lumber Company, for almost a year immediately preceding the accident. The pre-employment physical given by Dr. Thomas in 1964, when plaintiff started work for Urania, reported that plaintiff was able to work as a laborer.
Our jurisprudence is established that if, before the accident, the claimant is able to work and has been working regularly but, commencing with the accident, the symptoms of the disabling condition appear and continue to manifest themselves, a presumption arises that the disability is causally connected with the accident, provided the medical evidence shows there is a reasonable possibility of such causal connection. See Gates v. Ashy Construction Company, La.App., 171 So.2d 742 (3rd Cir. 1965) and the cases cited therein.
*359 This general rule has been applied to cases in which a pre-existing mental disease, or neurotic tendency, has been aggravated by injury, resulting in an episode of disabling psychotic or neurotic symptoms. Buxton v. W. Horace Williams Company, 203 La. 261, 13 So.2d 855 (1943); Tate v. Gullett Gin Company, et al., La.App., 86 So.2d 698 (1st Cir. 1956); Brown v. Crown Zellerbach Corporation, La.App., 112 So.2d 150 (1st Cir. 1959); Larson, Workmen's Compensation Law, Section 42.22; Malone, Louisiana Workmen's Compensation, 1964 p.o., Section 257.
Of course, the mere fact that a compensation claimant is unable to prove the exact medical cause of his disability does not preclude recovery. Nixon v. Pittsburgh Plate Glass Company, La.App., 166 So.2d 361 (3rd Cir. 1964) and the authorities cited therein. Thus, in the present case, the fact that some of the doctors thought plaintiff had a brain injury, whereas others said he had no brain damage but instead that a pre-existing mental condition was aggravated, does not require a denial of recovery. The medical evidence shows clearly that plaintiff is disabled and that there is a reasonable medical probability that this disability is causally connected with the accident.
For the reasons assigned, the judgment appealed is reversed and set aside. It is now ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, Charlie B. Cripps, and against the defendant, Urania Lumber Company, Ltd., condemning defendant to pay plaintiff the sum of $35 per week for each weekly period beginning July 14, 1965, not to exceed 400 weeks, together with interest at the rate of 5% per annum from maturity of each such weekly payment from its due date until paid, less a credit for such weekly amounts as may have been heretofore paid; together with an additional sum of not exceeding $2,500 for medical expense, subject to a credit for such amounts as may heretofore have been paid; also, all expert witness fees and other court costs, both in the lower court and in this court.
Reversed and rendered.
HOOD, J., dissents being of the opinion that the conclusions reached by the trial court are correct.

On Application for Rehearing.
En Banc. Rehearing denied.
HOOD, J., is of the opinion that a rehearing should be granted.
NOTES
[1] Dr. Phillip Bonn, a neurosurgeon, said an elevated protein count in the cerebral spinal fluid indicates something is irritating the brain, such as a tumor for instance.
[2] Plaintiff's marital difficulties and the suspicion that his wife was unfaithful will be discussed later in more detail.